IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

|  |  |  |
|---|---|---|
| ALETHEA R. HOLMES,<br>Plaintiff, | )<br>)<br>) |  |
| v. | )<br>) | Civil No. 3:17cv120 (REP) |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br>Defendant. | )<br>)<br>)<br>)<br>) |  |

## REPORT AND RECOMMENDATION

On January 22, 2013, Alethea R. Holmes ("Plaintiff") applied for Social Security Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from post-traumatic stress disorder ("PTSD"), depressive disorder, asthma, obsessive-compulsive disorder, median nerve injury, and lumbo-sacral strain with an alleged onset date of October 1, 2011. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim in a written decision and the Appeals Council denied Plaintiff's request for review. Plaintiff subsequently filed a civil action, and the Commissioner consented to remand the case. The Appeals Council remanded the case to the ALJ, who conducted a second hearing. The ALJ once again denied Plaintiff's claim in a written decision, and the Appeals Council denied Plaintiff's request for review, rendering the second ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in failing to properly weigh the opinions of Plaintiff's treating

psychiatrists and thereby properly determine her residual functional capacity ("RFC"), failing to properly evaluate Plaintiff's testimony and failing to adequately consider the Veterans Administration's ("VA") disability determination. (Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 10) at 16-27.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) and Motion to Remand (ECF No. 9) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On January 22, 2013, Plaintiff filed an application for DIB with an alleged onset date of October 1, 2011. (R. at 183-87.) The SSA denied these claims initially on June 27, 2013, and again upon reconsideration on April 15, 2014. (R. at 106-16, 118-24.) At Plaintiff's written request, the ALJ held a hearing on October 6, 2014. (R. at 37-80.) During the hearing, Plaintiff amended her alleged onset date to October 25, 2011. (R. at 23, 41.) On October 15, 2014, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 32.) On March 26, 2015, the Appeals Council denied Plaintiff's request for review. (R. at 820-25.)

---

[1] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

Plaintiff subsequently filed a civil action in this Court. (R. at 782-84.) On October 7, 2015, the Court entered an order remanding the case to further develop the record and evaluate Plaintiff's RFC. (R. at 788-89.) The Appeals Council remanded the case to an ALJ on February 10, 2016. (R. at 798-802.)

The ALJ held a second hearing on June 20, 2016. (R. at 749-81.) On June 28, 2016, the ALJ issued a written opinion, again denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because she could perform work that exists in the national economy. (R. at 726-42.) On December 9, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 711-14.)

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir.

3

1988)).  To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings.  *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists.  20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation).  To summarize, at step one, the ALJ looks at the claimant's current work activity.  § 404.1520(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  § 404.1520(a)(4)(ii).  Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii).  Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations.

§ 404.1545(a).  At step four, the ALJ assesses whether the claimant can perform her past work given her RFC.  § 404.1520(a)(4)(iv).  Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy.  § 404.1520(a)(4)(v).

## III.    THE ALJ'S DECISION

On June 20, 2016, the ALJ held a hearing during which Plaintiff (represented by counsel), a medical expert and a vocational expert testified.  (R. at 749-81.)  On June 28, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act.  (R. at 726-42.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim.  (R. at 730-41.)  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured, December 31, 2012.  (R. at 731.)  At step two, the ALJ determined that Plaintiff had the following severe impairments:  PTSD, depressive disorder, asthma, obsessive-compulsive disorder, median nerve injury and lumbo-sacral strain.  (R. at 731.)  Then, at step three, the ALJ found that Plaintiff did not have any impairment or combination of impairments that met or medically equaled one of the listed impairments.  (R. at 732.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work with certain limitations.  (R. at 734.)  Plaintiff could stand and/or walk for two hours in an eight-hour workday, with the option to alternate between sitting and standing every half hour.  (R. at 734.)  Plaintiff could occasionally balance, stoop, crouch or climb ramps and stairs.  (R. at 734.)  Plaintiff could frequently push or pull with her upper and lower extremities and could frequently grasp, handle or finger with her bilateral upper extremities.  (R. at 734.)

Plaintiff could never kneel, crawl or climb ladders, ropes or scaffolds. (R. at 734.) Plaintiff had to avoid exposure to hazards, pulmonary irritants, extreme temperatures, humidity and wetness. (R. at 734.) Mentally, Plaintiff could perform unskilled work in a non-production oriented work setting with no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 734.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 740.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 740-41.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 741.)

IV.   ANALYSIS

Plaintiff, forty-two years old at the time of this Report and Recommendation, previously worked as a ground radar repair person, an armed escort, a safety assistant and a research assistant. (R. at 230.) She applied for Social Security Benefits, alleging disability from PTSD, depressive disorder, asthma, obsessive-compulsive disorder, median nerve injury and lumbo-sacral strain, with an amended alleged onset date of October 25, 2011. (R. at 730, 759.)[2] Plaintiff's appeal to this Court alleges that the ALJ erred in (1) failing to properly weigh the medical opinions of her treating psychiatrists, and therefrom properly determine her RFC, (2) failing to properly evaluate Plaintiff's credibility and (3) failing to adequately consider the VA's disability determination. (Pl.'s Mem. at 16-27.) For the reasons set forth below, the ALJ did not err in her decision.

---

[2]      During both hearings, Plaintiff amended her alleged onset date to October, 25, 2011 — the day after she stopped working. (R. at 23, 41, 759.) In her opinion, the ALJ cites October 1, 2011 as the alleged onset date. (R. at 730.) The Court will use the amended alleged onset date that the record reflects and Plaintiff cites. (R. at 759; Pl.'s Mem. at 1-2.) However, the Court's analysis remains the same regardless of the October 1 or October 25, 2011 alleged onset date.

### A. Substantial Evidence Supports the ALJ's Assignment of Weight and RFC Determination.

Plaintiff argues that the ALJ erred in failing to properly weigh the medical opinions of her treating psychiatrists and thereby failed to adequately explain the mental limitations in Plaintiff's RFC. (Pl.'s Mem. at 16-24.) Specifically, Plaintiff contends that because the opinions of treating psychiatrists Meagan E. Cogbill, M.D., and Elbert F. Sholar, M.D., relied upon appropriate medical findings and did not contradict other evidence in the record, the ALJ erred when she failed to give the psychiatrists' opinions controlling weight. (Pl.'s Mem. at 22.) Defendant responds that the ALJ correctly determined Plaintiff's RFC. (Mem. in Support of Def.'s Mot. For Summ. J. ("Def.'s Mem.") (ECF No. 11) at 14.) Defendant contends that substantial evidence in the record supports the weight that the ALJ afforded the medical opinions. (Def.'s Mem. at 15-19.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. § 404.1527(c). If, however, the medical opinions prove inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p.[3] Licensed physicians and licensed or certified psychologists constitute acceptable medical sources. § 404.1502(a). The ALJ may also consider evidence from "other sources" — including nurse-practitioners, therapists and social workers — as evidence of the severity of impairment or for the effect that the impairments have on the claimant's ability to work. § 404.1513(d).[4] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Notably, the ALJ does not have to accept an opinion from a treating source that opines on the claimant's ultimate disability for employment purposes, or when the treating source's opinion is inconsistent with other evidence or is not well-supported. §§ 404.1527(c)(3)-(4), (d).

Unless the ALJ "dredged up 'specious inconsistencies,'" courts generally do not interfere with the ALJ's decision. *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070,

---

[3]       Effective March 27, 2017, the SSA rescinded SSR 06-03p, instead incorporating some of the Ruling's policies into 20 C.F.R. §§ 404.1527(f), 416.927(f).  82 Fed. Reg. 5844-01, at 5844–45, 5854–55 (Jan. 18, 2017).  Plaintiff filed her claim on January 22, 2013, before this regulation took effect. (R. at 183-87.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[4]       The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. § 404.1513(a).  The given examples are a non-exhaustive list.

1077 (7th Cir. 1999)).  In other words, the ALJ's assignments of weight stand unless the ALJ failed to offer a sufficient reason for his decision.  *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  § 404.1527(c).  However, the regulations specifically vest the ALJ with the authority to determine whether a claimant is disabled as defined under the Act.  § 404.1527(d)(1).

Additionally, an ALJ may consider the time frame of the evidence.  Here, Dr. Sholar and Dr. Cogbill only treated Plaintiff after the date last insured.  (R. at 369-70, 512, 577-78.)  The relevant time period spans from the amended alleged onset — October 25, 2011 — through the date last insured — December 31, 2012.  Plaintiff must prove her disability within that relevant time frame.  20 C.F.R. §§ 404.101(a), 404.130; *Johnson*, 434 F.3d at 655-56.  While the ALJ may consider evidence created after the date last insured, the evidence must provide a link to Plaintiff's condition *before* the date last insured.  *Bird*, 699 F.3d at 340-41.  Evidence "not linked in any manner to the claimant's condition before her [date last insured]" has no relevance on the ALJ's determination, and the ALJ does not need to retroactively consider it.  *Johnson*, 434 F.3d at 655-56.  When reviewing the ALJ's decision, the Court will therefore review evidence in the record from the relevant time period — from October 25, 2011 through December 31, 2012 — and any evidence thereafter that specifically relates back to Plaintiff's condition during that time.

## 1. Dr. Sholar's Opinion.

On June 14, 2013, Dr. Sholar completed a Psychiatric/Psychological Impairment Questionnaire, describing Plaintiff's prognosis as "poor to fair." (R. at 471-78.) Dr. Sholar listed Plaintiff's primary symptoms, including depressed mood, panic attacks, crying spells, poor sleep, difficulty concentrating and irritability. (R. at 473.) Dr. Sholar checked boxes indicating that Plaintiff had mild limitations in her ability to carry out simple instructions and to maintain socially appropriate behavior, neatness and cleanliness. (R. at 474-75.) Dr. Sholar opined that Plaintiff had moderate limitations in her ability to remember locations and procedures, to understand and remember one- or two-step instructions, to make simple work-related decisions, to appropriately interact with the public and ask simple questions or request assistance. (R. at 474-75.) Dr. Sholar also concluded that Plaintiff had moderate limitations noticing normal hazards and taking precautions, travelling to unfamiliar places or using public transportation and setting realistic goals. (R. at 476.)

Dr. Sholar opined that Plaintiff had marked limitations in the following areas: understanding, remembering and executing detailed instructions; maintaining concentration for extended periods; performing activities within a schedule; maintaining regular attendance and punctuality; sustaining ordinary routine without supervision; working with or near others without distraction; completing a normal workweek without interruptions; performing at a consistent pace without unreasonable breaks; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers without distracting them; and, responding appropriately to changes in the work setting. (R. at 474-75.)

Dr. Sholar opined that Plaintiff's symptoms dated back to as early as 2004. (R. at 478.) Dr. Sholar concluded that Plaintiff could not perform even low stress jobs and would miss work

more than three times per month. (R. at 477-48.)  Significantly, Dr. Sholar identified no laboratory or diagnostic test results that supported his medical opinion. (R. at 472.)

The ALJ afforded limited weight to Dr. Sholar's opinion. (R. at 738.)  The ALJ determined that Dr. Sholar's opinion conflicted with Plaintiff's "grossly conservative treatment history," moderate restrictions reflected in her mental evaluations and Plaintiff's admitted capabilities. (R. at 738.)  Additionally, the ALJ emphasized that Dr. Sholar's treatment did not begin until 2013, after the date last insured, and that his opinion conflicted with Plaintiff's work history between 2006 and 2011. (R. at 738.)

Dr. Sholar's treatment records, objective medical evidence and Plaintiff's statements regarding her daily activities support the ALJ's assignment of weight to Dr. Sholar's opinion. First, Dr. Sholar offered no explanation for how he determined that Plaintiff's symptoms and limitations had persisted since 2004. (R. at 478.)  Indeed, Dr. Sholar cited no test results to support his conclusions. (R. at 472.)  Similarly, Dr. Sholar provided no link by which the ALJ could connect Dr. Sholar's June 2013 opinion with Plaintiff's condition before her date last insured, over a year and a half earlier. (R. at 471-78.)

Second, Dr. Sholar's own treatment records support the ALJ's decision to afford limited weight to his opinion.  Plaintiff saw Dr. Sholar twice, and both appointments occurred after Plaintiff's date last insured. (R. at 369, 577.)  On February 25, 2013 — sixteen months after the relevant period ended — Plaintiff first presented to Dr. Sholar at McGuire VA Medical Center for medication management to treat her PTSD and depression. (R. at 369.)  During that appointment, Dr. Sholar reviewed Plaintiff's past records with her. (R. at 369.)  According to Dr. Sholar's notes, Plaintiff reported "having problems" since 2004, after she served in Iraq. (R. at 369.)  However, Dr. Sholar did not specify from which conditions or to what extent Plaintiff

11

had suffered limitations during that time.  (R. at 369.)  Plaintiff's then-current symptoms

included depressed mood, poor sleep, increased appetite, weight gain, crying spells, poor

concentration, low energy, anhedonia, nightmares, flashbacks and irritability.  (R. at 369.)  She

isolated herself and avoided being in public.  (R. at 369.)

During the visit, Dr. Sholar provided "supportive psychotherapy."  (R. at 370.)  Plaintiff

had interest in continuing psychotherapy, but she only had availability on Saturdays due to her

schedule caring for her two children and her sister's three children.  (R. at 369-70.)  In his mental

status examination, Dr. Sholar noted that Plaintiff remained cooperative with a depressed mood,

adequate grooming, good eye contact and insight, as well as normal thought processes and

speech.  (R. at 371.)  Based on his assessment, Dr. Sholar continued Plaintiff on the same

treatment plan.  (R. at 372.)

Plaintiff returned to Dr. Sholar on May 31, 2013, again after the relevant period, this time

with her husband and two children.  (R. at 577.)  Plaintiff reported feeling more depressed and

having anxiety attacks at night.  (R. at 577.)  Plaintiff did not feel that fluoxetine had improved

her symptoms.  (R. at 577.)  Plaintiff reported that trazodone improved her sleep, but she did not

take it each night.  (R. at 577.)  Dr. Sholar reminded Plaintiff that she had five refills of the

medication, and she could take it nightly.  (R. at 577.)  Once again, a mental status examination

revealed a depressed mood.  (R. at 578.)  However, Plaintiff appeared adequately groomed,

cooperative, logical and coherent.  (R. at 577.)

These two treatment records reveal that Plaintiff had ongoing problems with depression

and anxiety, but they lack the severity of limitation to which Dr. Sholar opined.  For example,

Dr. Sholar opined that Plaintiff had marked limitations sustaining concentration and persistence;

however, both of Dr. Sholar's mental examinations of Plaintiff revealed logical and goal-oriented

thought processes, relevant and coherent speech, as well as normal thought content. (R. at 371, 474, 577-78.) Indeed, beyond a depressed mood and flat but appropriate affect, Dr. Sholar's treatment notes remained largely unremarkable. (R. at 371-72, 577-78.)

Objective medical evidence in the record further supports the ALJ's assignment of limited weight to Dr. Sholar's opinion. On October 4, 2011, Plaintiff presented to Olivia P. Davis, a licensed clinical social worker, for supportive psychotherapy. (R. at 331-32.) Plaintiff reported feeing unhappy, tearful, depressed and trapped. (R. at 332.) She denied, however, any return of PTSD symptoms as well as suicidal or homicidal ideations. (R. at 332.) Davis suggested possible psychiatric medication, but Plaintiff declined a referral for review by her primary care physician. (R. at 332.) Davis described Plaintiff's appearance as "casually dressed with good hygiene and grooming." (R. at 332.) Davis noted Plaintiff's mood as mildly depressed, and concluded that she could respond to outpatient treatment. (R. at 332.)

On October 18, 2011, Plaintiff returned to Davis. (R. at 330.) Plaintiff appeared alert and well-groomed with a depressed mood but no observable behavioral problems. (R. at 330.) Davis noted that Plaintiff showed motivation to find solutions to her stressors and requested a psychiatry referral. (R. at 330-31.) On November 1, 2011, a week after quitting her job, Plaintiff returned to Davis. (R. at 321.) Plaintiff had quit her job because of the severity and intensity of the re-emergence of her PTSD symptoms due to the "toxic" work environment. (R. at 321.) Her reported symptoms included nightmares, flashbacks, increased difficulty focusing, racing thoughts, shakiness, headaches and intrusive thoughts. (R. at 321.) Davis noted that Plaintiff appeared alert, with a full and reactive affect and depressed mood. (R. at 322.) Plaintiff felt relief from quitting her job, and admitted that her PTSD symptoms had since receded. (R. at 321-22.)

13

On December 14, 2011, Plaintiff returned, complaining of worsening depression due to stressors in her family life, including her son's juvenile detention. (R. at 318.) Davis noted impaired sleep and concentration as well as increased depression and anxiety. (R. at 318-19.) Davis helped Plaintiff recognize the matters that she could control, and encouraged Plaintiff to contact her psychiatrist for potential adjustments to her medication. (R. at 319.) Plaintiff returned to Davis on December 23, 2011. (R. at 315.) Davis noted that Plaintiff still felt depressed and anxious about her son — a special needs child — who continued to struggle with behavioral and cognitive issues. (R. at 316.) Davis noted that while Plaintiff exhibited increased anxiety, she responded to calming strategies. (R. at 316.) Davis' mental status observations of Plaintiff remained unchanged. (R. at 316.)

On January 10, 2012, Plaintiff continued her individual psychotherapy. (R. at 314-15.) Davis noted that Plaintiff's depression had improved, though she remained anxious. (R. at 315.) She remained alert, oriented and well-groomed with normal speech and thought content. (R. at 315.) Plaintiff returned on February 8 and March 2, 2012, and Davis made similarly unremarkable mental evaluation notations. (R. at 306-07, 313-14.) During the March 2 therapy session, Plaintiff reported the return of PTSD symptoms including intrusive memories, nightmares, hypervigilance and avoidance by mild dissociation. (R. at 307.) Nonetheless, Davis also noted that Plaintiff had started homeschooling her son, and that she continued to successfully advocate for him in a "healthy/legal manner." (R. at 306-07.)

On March, 16, 2012, Davis once again documented improvements in Plaintiff's symptoms. (R. at 305.) Davis noted a decrease in Plaintiff's acknowledged PTSD symptoms. (R. at 305.) Davis and Plaintiff discussed strategies for Plaintiff to meet possible friends and establish a stronger support system. (R. at 305.) While Plaintiff attended neighborhood parties,

she did not share common interests with her neighbors or her husband's friends.  (R. at 305.)
Plaintiff remained motivated to work through her problems.  (R. at 305.)

On March 30, 2012, Davis assessed Plaintiff with "moderate depression" but decreased
anxiety.  (R. at 300-01.)  However, Plaintiff remained proactive in resolving her issues.  (R. at
300.)  After the previous session, Plaintiff registered on meetup.com, joined three separate
groups and attended a hiking event — all with positive results.  (R. at 300.)  On April 11, 2012,
Plaintiff again met with Davis, whose findings remained unchanged.  (R. at 299.)  Plaintiff
returned on April 25, 2012 and May 11, 2012.  (R. at 284-85, 292.)  On both occasions, Davis
noted similar symptoms.  (R. at 284-85, 292.)  Plaintiff remained depressed — though optimistic
about her upcoming move — and less anxious.  (R. at 285, 292.)

On May 25, 2012, Plaintiff saw Davis again.  (R. at 281.)  Davis described Plaintiff's
mood as less depressed and less anxious.  (R. at 281.)  Plaintiff remained alert, well-groomed and
appropriately dressed, with coherent, goal-oriented speech, logical thought content and no
observable behavior problems.  (R. at 281.)

On June 8, 2012, Plaintiff had her final therapy session with Davis due to her upcoming
move to Richmond, Virginia, and child care conflicts.  (R. at 279-80.)  In fact, the session ended
early, because Plaintiff needed to take care of her children.  (R. at 280.)  Plaintiff felt optimistic
about the upcoming move and her mental health care.  (R. at 280.)  She planned to seek
treatment from the local VA in Richmond after the move.  (R. at 280.)  Davis explained that
Plaintiff made "considerable improvement and continues to exhibit good motivation for
continued treatment."  (R. at 280.)  Plaintiff had also "responded well to therapeutic
intervention."  (R. at 280.)

15

During the relevant time period, Plaintiff sought treatment from Maria Luisa Obregon, M.D. — a psychiatrist with the VA in South Texas. (R. at 322, 328.) On October 20, 2011, Plaintiff presented to Dr. Obregon for a psychiatric intake evaluation. (R. at 322.) Plaintiff complained of worsening PTSD symptoms. (R. at 323.) Dr. Obregon noted that Plaintiff had worsening depressive and PTSD symptoms because of her stressful job. (R. at 327.) A staff psychiatrist reported Plaintiff's history of good results using depression medications, but also that Plaintiff had stopped taking such medication. (R. at 328-29.) Dr. Obregon prescribed a low dose of Prozac to treat Plaintiff's depression. (R. at 328.)

On February 9, 2012, Plaintiff returned to Dr. Obregon. (R. at 309.) Plaintiff reported good compliance with Prozac, but she indicated that the medication had not relieved her symptoms. (R. at 309.) Instead, Plaintiff reported feeling "depressed and numb." (R. at 309.)

By her next appointment on April 19, 2012, Plaintiff reported sleeping better and eating well. (R. at 293.) While Plaintiff felt depressed at times, she did not feel depressed as often or as severely as she had a month before. (R. at 293.) Dr. Obregon's assessment indicated that Plaintiff's condition had slowly improved, and that Plaintiff coped well with family stressors despite "some remaining depression." (R. at 294.) Dr. Obregon performed a PTSD screening on Plaintiff that yielded negative results. (R. at 296-97.)

On May 24, 2012, Plaintiff returned to Dr. Obregon. (R. at 282.) Plaintiff reported improved interactions with others and improved self-esteem. (R. at 282.) Dr. Obregon assessed Plaintiff as "doing much better" on a higher dosage of Prozac. (R. at 283.)

During the relevant time period, Plaintiff also saw Melanie Ottenbacher, M.D. — another psychiatrist with the VA in South Texas. (R. at 273, 275-79.) On July 12, 2012, Plaintiff presented to Dr. Ottenbacher, and she reported "doing well." (R. at 275-76.) Plaintiff's

medication had improved her mood, she did not feel as anxious, her PTSD symptoms had improved, and she reported no side effects from taking Prozac. (R. at 276.) Upon mental examination, Dr. Ottenbacher described Plaintiff's mood as "euthymic" or normal and non-depressed. (R. at 276.)

Dr. Obregon's and Dr. Ottenbacher's treatment records reveal that Plaintiff's conditions remained controlled and her symptoms reduced through medication management. Though Plaintiff continued to experience certain symptoms from her PTSD and depression, these records show that her symptoms did not impose the extreme limitations to which Dr. Sholar opined.

Finally, Plaintiff's own statements about her daily activities conflict with the medical opinion of Dr. Sholar and support the ALJ's assignment of limited weight. On April 18, 2013, Plaintiff completed a function report. (R. at 221-28.) In the report, Plaintiff explained that she took care of her two children and three of her nephews. (R. at 222.) She woke up at six in the morning with her oldest son to get him ready for school. (R. at 221.) Plaintiff cooked breakfast most mornings. (R. at 221.) During the day, while the older children attended school, she cared for her younger son — then-four years old with special needs — and her youngest nephew. (R. at 221.) In the evening, Plaintiff cooked dinner for her family and helped her husband get the younger children to bed. (R. at 221.) Plaintiff indicated that she prepared meals daily, and her cooking habits had not changed since her alleged disability began. (R. at 223.) She had no problems with personal care, but she sometimes set reminders to take her medication. (R. at 222-23.)

Plaintiff stated that she typically shopped for groceries at least two or three times per month with her husband and children, and she shopped for clothing "every now and then." (R. at 224.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook. (R.

at 224.)  Her ability to do these tasks also had not changed since the alleged onset of her

condition.  (R. at 225.)  Her hobbies included reading, walking, crocheting and watching

television and movies.  (R. at 225.)  She did not do these as often because of her diminished

ability to focus.  (R. at 225.)  Plaintiff attended family gatherings a few times per year.  (R. at

225.)  She claimed to sometimes have problems socializing with family and friends, because she

became easily irritated and felt uncomfortable around people.  (R. at 226.)  When socializing,

Plaintiff needed to take breaks.  (R. at 228.)  She stated that, but for her husband and children,

she would probably never leave her house.  (R. at 228.)

Plaintiff's statements during the hearing before the ALJ largely comport with her

functional report.  (R. at 37-80.)  She testified that she attended parent-teacher conferences for

her younger son.  (R. at 59.)  Plaintiff typically drove four times per week, and she tried to go to

the gym roughly twice per week.  (R. at 59.)  In addition to periodically cleaning, she also would

do yard work and go to Home Depot seeking lawn care advice.  (R. at 60.)  Plaintiff testified that

she and her family would typically go to the mall or out to dinner weekly.  (R. at 64.)

Plaintiff's admissions about her daily activities lend sufficient support to the ALJ's

decision to give Dr. Sholar's opinion limited weight.  For example, Dr. Sholar opined that

Plaintiff had marked limitations maintaining a schedule and punctuality, moderate limitations

understanding one- or two-step instructions and marked limitations sustaining an ordinary

routine without supervision.  (R. at 474.)  However, Plaintiff served as the primary caregiver to

as many as five children, including her younger son with special needs.  (R. at 59, 221-23, 316.)

She prepared the children for school in the morning, shopped for groceries, cooked her family

meals, cleaned the house, and went on weekly family outings.  (R. at 64, 221-24.)  These

activities demonstrate that Plaintiff could and indeed did accomplish far more in a given day than Dr. Sholar's restrictive opinion would suggest.

In sum, inconsistencies between Dr. Sholar's opinion and his own treatment records, objective medical evidence, and Plaintiff's own statements support the ALJ's assignment of limited weight to that opinion.  Consequently, the ALJ did not err.

### 2. Dr. Cogbill's Opinion.

Likewise, the ALJ properly afforded limited weight to the opinion of Dr. Cogbill. Plaintiff first saw Dr. Cogbill on September 30, 2013 — after the relevant time period.  (R. at 512.)  Dr. Cogbill noted improvement since Plaintiff had last seen Dr. Sholar in May 2013.  (R. at 512.)  Plaintiff reported some improvement from her medications, but she still had symptoms of depression, including crying spells, poor sleep, decreased appetite, difficulty with concentration and memory, as well as anhedonia.  (R. at 512.)  Dr. Cogbill recorded Plaintiff's mood as "ok – down."  (R. at 512.)  Plaintiff remained calm with appropriate affect and normal thought process.  (R. at 512.)

On March 31, 2014, Plaintiff returned to Dr. Cogbill, complaining of continued anxiety. (R. at 603.)  Plaintiff reported increased anxiety when she left the house, but she could often manage it.  (R. at 603.)  Plaintiff had interest in individual psychotherapy, but needed to make sure it worked with her schedule.  (R. at 603.)  Dr. Cogbill's mental status examination yielded unremarkable results.  (R. at 603.)

On July 7, 2014, Plaintiff returned to Dr. Cogbill for medication management.  (R. at 621-22.)  Plaintiff's conditions persisted, but Dr. Cogbill described Plaintiff as alert and oriented, calm and cooperative.  (R. at 621.)  Plaintiff displayed normal speech, appropriate affect, logical and goal-directed thought process, as well as fair insight into her illness.  (R. at 621.)  Plaintiff

denied suicidal or homicidal ideations, and she indicated that she could pursue psychotherapy in the fall, when her son went to school. (R. at 621, 623.)

On October 1, 2014, Dr. Cogbill wrote a letter outlining her assessment of Plaintiff's condition based on her interactions with Plaintiff and a review of Plaintiff's records. (R. at 702.) She had treated Plaintiff for PTSD and major depressive disorder with anxious features. (R. at 702.) Dr. Cogbill explained that Plaintiff showed motivation for treatment and adhered to her treatment plan. (R. at 703.) She explained that Plaintiff took several medications that decreased her symptom severity, but they also caused side effects that could impair occupational functioning. (R. at 703.) Dr. Cogbill opined that Plaintiff could not perform full-time competitive work due to her mental impairment that dated back to 2011. (R. at 703.) Dr. Cogbill concluded that Plaintiff's condition allowed her to engage in only limited stress situations and few interpersonal relationships. (R. at 703.) Dr. Cogbill described Plaintiff's symptoms as "currently stable," but opined that exposure to work-related stress could exacerbate her condition. (R. at 703.)

That same day, Dr. Cogbill completed a mental impairment questionnaire. (R. at 705-09.) Dr. Cogbill identified Plaintiff's most frequent and/or severe symptoms as depression, anxiety, panic attacks, emotional stability, hypervigilance, paranoia, exaggerated startle response and nightmares. (R. at 707.) Dr. Cogbill opined that Plaintiff's symptoms dated as far back as October 1, 2011. (R. at 709.) Notably, Dr. Cogbill left blank the entire section regarding Plaintiff's specific limitations due to her mental impairments, noting that such limitations fell "outside [the] scope of [a] general psych[iatric] eval[uation]." (R. at 708.)

On January 26, 2015, Plaintiff returned to Dr. Cogbill for a follow-up examination and medication management. (R. at 1109.) Dr. Cogbill noted that Plaintiff still suffered from PTSD

and moderate major depressive disorder with anxious features. (R. at 1109.) Plaintiff again

returned to Dr. Cogbill on May 6, 2015; June 9, 2015; August, 25, 2015; and, November 30,

2015 for additional follow-up examinations and medication management. (R. at 1036-37, 1043-

44, 1055, 1065-66.) While Plaintiff's stress and anxiety levels fluctuated during these

appointments, Dr. Cogbill's mental status examinations remained unremarkable. (R. at 1036-37,

1043-44, 1055, 1065-66.)

On May 2, 2016, Dr. Cogbill wrote an additional letter outlining her assessment of

Plaintiff's condition. (R. at 1113-14.) Virtually identical to the opinion that she penned in

October 2014, this second letter also included information about Plaintiff's treatment for

insomnia. (R. at 702-03, 1113-14.)

Finally, on June 29, 2016 — the day after the ALJ's decision — Dr. Cogbill completed a

form assessing Plaintiff's affective and anxiety-related disorders. (R. at 1115-19.) This time,

Dr. Cogbill checked boxes indicating that Plaintiff had met the criteria for Listings 12.04

(affective disorders) and 12.06 (anxiety-related disorders) since February 2007. (R. at 1115-17.)

The ALJ gave Dr. Cogbill's October 2014 and May 2016 opinions limited weight as

assessments of Plaintiff's functioning before her date last insured. The ALJ noted the time frame

of Plaintiff's treatment with Dr. Cogbill. (R. at 739.) The ALJ concluded that Dr. Cogbill's

opinions conflicted with Plaintiff's conservative and outpatient treatment, clinical assessments

that reflected no more than moderate functional limitations and Plaintiff's admitted activities.

(R. at 739.)

The same evidence detailed above that detracts from Dr. Scholar's opinion also supports

the ALJ's decision to give limited weight to Dr. Cogbill's opinions. During the relevant period,

mental status examinations often yielded unremarkable results. (R. at 276, 280-81, 294, 299-

301, 305-07, 313-14, 316, 321-22, 371, 577-78.)  Throughout that time, treatment providers

noted Plaintiff's progress and improved symptoms.  (R. at 280-83, 285, 292, 294, 305, 315.)

Plaintiff's regular activities — including caring for five children, cooking, cleaning and shopping

— also conflict with Dr. Cogbill's conclusory opinion that Plaintiff could not perform full-time

work.  (R. at 59, 60, 64, 221-24, 316, 703.)  Moreover, like Dr. Sholar, Dr. Cogbill did not treat

Plaintiff until after the relevant period.  Dr. Cogbill checked a box that Plaintiff's limitations

dated back to at least October 1, 2011, but she offered no explanation for how she determined

that date — which pre-dated her treatment of Plaintiff.  (R. at 702-03, 709.)  Additionally, while

Dr. Cogbill listed Plaintiff's symptoms that allegedly prevented her from working, Dr. Cogbill

declined to opine as to Plaintiff's specific degrees of mental limitation, stating that such

limitations went beyond the scope of her "general psych[iatric] eval[uation]."  (R. at 706-08.)

Substantial evidence in the record supports the ALJ's decision to afford Dr. Cogbill's opinions

limited weight.

### B. The ALJ Properly Evaluated Plaintiff's Credibility.

Plaintiff argues that the ALJ failed to properly evaluate her credibility and erred in

finding that Plaintiff's treatment record did not support her statements about her condition.  (Pl.'s

Mem. at 24-26.)  Defendant responds that substantial evidence supports the ALJ's decision to

discount Plaintiff's statements about the intensity, persistence and limiting effects of her

symptoms.  (Def.'s Mem. at 20.)

The ALJ must evaluate a claimant's RFC after step three of the sequential analysis, but

before deciding whether a claimant can perform past relevant work at step four.  20 C.F.R.

§§ 404.1520(e)-(f), 404.1545(a)(1).  In determining Plaintiff's RFC, the ALJ must consider all

presented evidence when evaluating a claimant's symptoms, including statements about the

claimant's symptoms, evidence submitted by the claimant's medical sources and evidence submitted by SSA employees and others.  § 404.1529(c)(3).  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.[5]

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)).  When the ALJ appropriately considers all relevant factors, hears the claimant's testimony and observes his demeanor, the ALJ's credibility determination deserves such deference. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).  Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that a claimant's subjective allegations of pain are not, alone, conclusive evidence of disability. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be

---

[5]       On March 16, 2016, the Agency issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here.  Plaintiff filed her claim on January 22, 2013, before SSR 16-3p took effect. (R. at 183-87.)  As previously stated, the Agency does not have the power to engage in retroactive rulemaking.  Thus, the Court will review the ALJ's decision under SSR 96-7p.

expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, Plaintiff testified that when she last worked in 2011, she cried often, experienced anxiety and felt sick to her stomach. (R. at 52-54.) As soon as she earned a day off of work, she took it. (R. at 53-54.) Beyond back pain and plantar fasciitis in her feet, Plaintiff stated that she did not experience physical problems. (R. at 55-56.) Plaintiff testified that she cried "almost every day" and had trouble with her short-term memory. (R. at 66.) However, she remembered to take her medications, sometimes with a reminder from her husband. (R. at 66-67.) Plaintiff claimed to have difficulty dealing with others, stating that she did not consider herself "a friend person." (R. at 67.)

Plaintiff stated that her medication controlled her nighttime anxiety attacks. (R. at 67.) Although Plaintiff described her daytime anxiety attacks as "bad," those attacks did not match the intensity of the nighttime attacks. (R. at 67-68.) She also testified that her anxiety increased whenever she left the house. (R. at 74.) Plaintiff continued to regularly experience nightmares, though she did not always remember them. (R. at 70.)

The ALJ found that while Plaintiff's medically determinable impairments could reasonably cause her alleged symptoms, Plaintiff's statements about the intensity, persistence and limiting effects of those symptoms did not entirely comport with the medical evidence and other evidence in the record. (R. at 735.) The objective medical evidence detailed above supports the ALJ's credibility assessment. During the relevant period, Plaintiff saw Olivia Davis for outpatient individual psychotherapy fifteen times. (R. at 279, 281, 284, 292, 299-300, 305-06, 313-15, 318, 321, 330-31.) She consistently improved throughout her course of treatment. For example, during many sessions, Davis noted that Plaintiff had become less depressed and/or

less anxious — improvements from both medication and therapy. (R. at 280-81, 285, 292, 299-300, 305, 307, 314-15.) On March 2, 2012, Plaintiff felt "more positive" as she navigated her son through disciplinary issues at school. (R. at 306.) On March 16, 2012, Plaintiff acknowledged that some of her PTSD symptoms had diminished. (R. at 305.) Davis noted Plaintiff's motivation to continue making progress. (R. at 305.) On March 30, 2012, Davis described the proactive steps that Plaintiff had taken, including joining various social groups and hiking. (R. at 300.) Plaintiff saw positive results from these activities as well as from her medication. (R. at 300.)

In April 2012, Plaintiff reported improved sleep. (R. at 293.) By May 2012, Plaintiff continued to exhibit less intense symptoms. (R. at 281.) During Plaintiff's last session, Davis noted Plaintiff's "considerable improvement" and "good motivation for continued treatment." (R. at 280.) Like Davis' treatment records, Dr. Obregon's assessments of Plaintiff's condition similarly conflict with Plaintiff's claimed severity of symptoms. Dr. Obregon noted that Plaintiff made improvements during her course of treatment. (R. at 282-83, 293-94.)

As detailed above, Plaintiff's admitted daily activities run contrary to her statements about the intensity of her symptoms. In her function report, Plaintiff explained that she provided the primary care to her two children and three nephews. (R. at 222.) She had no problems with personal care, typically cooked dinner for her family and prepared her children for school most mornings. (R. at 221-22.) Plaintiff could manage her finances without difficulty. (R. at 224.) Plaintiff continued to attend parent-teacher conferences, and she went to the mall and out to dinner with her family every week or every other week. (R. at 59, 64.)

Further, Plaintiff offered additional statements during the hearing that contradict the severity of symptoms that she alleged. For example, Plaintiff testified that she did housework

whenever her husband complained enough that she felt guilty. (R. at 57-58.) Twice per month, Plaintiff went on a "cleaning frenzy" around her home. (R. at 58.) Every school day, she administered her son's medications, packed his backpack, groomed and dressed him and walked him to the school bus stop. (R. at 68.) She stated that she drove "[e]very time [that she] . . . need[ed] to" — including to every appointment, everything that her younger son needed to attend and every time that she "need[ed] something." (R. at 58-59.) Plaintiff went to the gym twice per week. (R. at 59.) In an average day, Plaintiff might watch a whole season of a television show, spend roughly three hours on the internet and spend another hour playing games on her phone. (R. at 61-62, 69-70.)

These activities demonstrate that Plaintiff's conditions did not inhibit her to the extent that she alleged. For example, Plaintiff left her house most every day and drove whenever she needed to, despite alleging debilitating levels of anxiety whenever she left home. (R. at 58-59, 74.) Plaintiff devoted much of her time each day to caring for her young son with special needs, as well as watching television, surfing the internet and playing games on her phone. (R. at 61-62, 68-70.) Plaintiff's admissions about her daily activities lend sufficient support to the ALJ's credibility assessment.

Objective medical evidence and contradictions within Plaintiff's own statements demonstrate that her symptoms did not restrict her as much as she alleged. Thus, the ALJ did not err in finding Plaintiff not entirely credible.

### B. The ALJ Erred in Assessing the VA's Disability Determination, but the Error is Harmless.

Finally, Plaintiff argues that the ALJ erred in assessing the VA's disability determination. (Pl.'s Mem. at 26-27.) As in her previous arguments, Plaintiff avers that the evidence cited by the ALJ to discount the VA's disability rating in fact supports a finding of mental disability.

26

(Pl.'s Mem. at 26-27.)  Defendant maintains that the ALJ afforded appropriate consideration to the VA assessment.  (Def.'s Mem. at 22-23.)

On February 6, 2012, the VA sent Plaintiff a letter summarizing her then-current VA benefits.  (R. at 633.)  Since December 1, 2011 at the latest, the VA assessed Plaintiff with 80% service-connected disability.  (R. at 633.)  However, the VA paid Plaintiff benefits at a 100% rate, "because [the VA found her to be] unemployable due to [he]r service-connected disabilities."  (R. at 633.)

While disability determinations made by other governmental agencies do not bind the SSA, the ALJ still must "evaluate all the evidence in the case record that may have a bearing on [the] determination or decision of disability."  SSR 06–03p.  In *Bird*, the Fourth Circuit directly addressed the weight that an ALJ assigns to the determinations of the VA.[6]  699 F.3d 337.  The Fourth Circuit acknowledged that the SSA and the VA apply different standards in determining disability, but noted that both agencies "serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability," and that both require extensive medical documentation.  *Id.* at 343.  As a result, a disability rating by one of the two agencies remains "highly relevant to the disability determination of the other."  *Id.*  Accordingly, an ALJ must presumptively afford a VA determination substantial weight.  *Id.*

However, the Fourth Circuit also recognized that the "SSA employs its own standards for evaluating a claimant's alleged disability, and the effective date of coverage . . . under the two programs will likely vary."  *Id.*  Therefore, the Commissioner may afford a VA determination less than substantial weight if "the record before the ALJ *clearly demonstrates* that such a

---

[6]     Effective March 27, 2017, the SSA no longer analyzes decisions made by other agencies. 20 C.F.R. § 404.1504 (2017).  Thus, *Bird* does not control claims filed on or after March 27, 2017.  Because Plaintiff filed her claim in 2013, *Bird* applies here.

deviation is appropriate." *Id.* (emphasis added).

To satisfy the *Bird* standard, the ALJ may not dismiss a VA rating decision in a conclusory fashion. *Parker v. Colvin*, 2015 WL 5561213, at *15 (E.D. Va. Sept. 11, 2015). Rather, the ALJ must discuss, in detail, why the VA determination deserves only limited weight. *Id.* For example, the court in *Sykes v. Berryhill* noted that an ALJ satisfied *Bird* by using "a full page of analysis" to explain inconsistences between the plaintiff's testimony, medical records and the VA rating, and to detail the reasons for affording the VA determination less than substantial weight.  2017 WL 4401480, at *11 n.12 (E.D. Va. Aug. 25, 2017), *R. & R. adopted*, 2017 WL 4381682 (E.D. Va. Oct. 2, 2017).

"When the ALJ has not weighed the disability determination of another governmental entity in accordance with the Fourth Circuit's *Bird* decision, remand is the appropriate remedy." *Idlett v. Berryhill*, 2017 WL 2371831, at *4 (E.D. Va. May 5, 2017), *R. & R. adopted*, 2017 WL 2374394 (E.D. Va. May 31, 2017); *see also Cochran v. Colvin*, 2016 WL 8453568, at *5 (E.D. Va. Dec. 28, 2016), *R. & R. adopted*, 2017 WL 889621 (E.D. Va. Mar. 6, 2017) (noting that "remand is typically required" when an ALJ fails to properly explain his reasons for affording less than substantial weight to a VA disability rating); *Lee v. Colvin*, 2016 WL 5741538, at *7 (E.D. Va. Nov. 29, 2016) (remanding where the ALJ failed to provide "cogent reasons" for declining to attribute substantial weight to VA disability ratings).

Here, the VA determined that Plaintiff had 80% service-connected disability, but she later received VA benefits at the 100% disability rate, because the VA considered her unemployable and permanently disabled from her service-connected disabilities. (R. at 338, 633.) The VA allotted the following ratings for Plaintiff's service-connected disabilities:  60% for asthma; 30% for PTSD; 10% for hiatal hernia; 10% for inflammation of median nerve; 10% for lumbosacral

strain; and 10% for additional inflammation of median nerve. (R. at 338.) After reviewing the VA disability rating, the ALJ afforded it "limited weight," finding "the degree of restrictions . . . not entirely congruent with the grossly conservative treatment history during the period at issue, the documented clinical and examination findings, or Ms. Holmes' stated ongoing capabilities." (R. at 739.)

The ALJ misstated the *Bird* standard. The ALJ stated that VA disability determinations "deserve substantial weight unless there are *good reasons* for giving them less weight." (R. at 739 (emphasis added).) But *Bird* requires the ALJ to give substantial weight to the VA's determination unless the record "*clearly demonstrates* that such a deviation is appropriate." *Bird*, 699 F.3d at 343 (emphasis added). Accordingly, the ALJ erred. However, the ALJ explained why she gave the VA's determination limited weight, and therefore the Court next considers whether any harm resulted from the error.[7] *See Thompson v. Berryhill*, 2018 WL 715597, at *15 (E.D. Va. Jan. 18, 2018) (remanding where ALJ misstated *Bird*'s standard and failed to adequately explain, but acknowledging potential for harmless error if ALJ had offered sufficient explanation), *R. & R. adopted*, 2018 WL 717346 (Feb. 5, 2018).

_____

[7]     Although the Fourth Circuit has yet to apply the harmless error rule to Social Security Disability cases in a published opinion, it has applied the doctrine when reviewing Social Security appeals in several unpublished opinions. *See Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015) (finding failure to explicitly assign weight to treating physician constituted harmless error); *Garner v. Astrue*, 436 F. App'x 224, 225 (4th Cir. 2011) (finding drafting error to constitute harmless error); *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005) (finding error by ALJ regarding sit/stand restrictions to be harmless). Consequently, the Court has previously held that the harmless error rule applies to Social Security Disability appeals. *Keaton v. Colvin*, 2016 WL 8452663, at *6-7 (E.D. Va. July 11, 2016) *R. & R. adopted*, 2017 WL 875477 (E.D. Va. Mar. 3, 2017); *James v. Colvin*, 2014 WL 4630598, at *15 (E.D. Va. Sept. 11, 2014).

The burden of establishing harmful error rests on "the party attacking the agency's determination." *Shineski v. Sanders*, 556 U.S. 396, 409 (2009).  As the Court in *Sanders* explained:

> To say that the claimant has the "burden" of showing that an error was harmful is not to impose a complex system of "burden shifting" rules or a particularly onerous requirement. . . . Often the circumstances of the case will make clear to the appellate judge that the ruling, if erroneous, was harmful and nothing further need be said. But, if not, then the party seeking reversal normally must explain why the erroneous ruling caused harm.

*Id.* at 410.  Thus, when reviewing a decision for harmless error, a court must look at, among other things:

> [A]n estimation of the likelihood that the result would have been different, an awareness of what body . . . has the authority to reach the result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.

*Id.* at 411-12. (citations omitted).  And "where the circumstances of the case show a likelihood of prejudice, remand is appropriate so that the agency can decide whether consideration is necessary." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2010).  Against this standard, the Court finds that the ALJ's error constituted a harmless error for the following reasons.

The ALJ clearly explained that she gave the VA disability decision limited weight, because it conflicted with three categories of evidence detailed earlier in her decision: (1) Plaintiff's grossly conservative treatment history during the relevant period; (2) the clinical and examination findings; and, (3) Plaintiff's admitted ongoing abilities. (R. at 739.) The ALJ pointed to specific evidence in the record that supported her assessment, and substantial evidence supports that determination. (R. at 739.)

As discussed in detail above, Plaintiff showed relatively steady improvement in her symptoms — through both her medications and therapy. (R. at 280-83, 285, 292, 294, 305, 314-15.) The ALJ reviewed Davis' and Dr. Obregon's conservative treatment of Plaintiff throughout the relevant period as well as Plaintiff's own statements about her daily activities. (R. at 735-38.) During the relevant period, Plaintiff continued to improve. For example on January 10, 2012, Plaintiff felt less depressed and anxious than when she had started therapy with Davis. (R. at 314.) In March 2012, Plaintiff's PTSD symptoms had decreased. (R. at 305.) Plaintiff and Davis discussed the potential for Plaintiff to socialize and meet new friends through her college or online meetup groups. (R. at 305.) In June 2012, during her last appointment with Plaintiff, Davis explained that Plaintiff had made "considerable improvement and continue[d] to exhibit good motivation for continued treatment." (R. at 280.)

In addition to the conservative outpatient treatment that Plaintiff received during the relevant period, the ALJ found that Plaintiff's activities of daily living did not entirely comport with the VA disability determination. (R. at 739.) While the VA found that Plaintiff had 80% service-connected disability, her daily activities indicated that she remained reasonably active, and her lifestyle had not changed drastically after the alleged onset of her disability. (R. at 57-70, 74, 221-22, 224.) As explained above, Plaintiff cared for children, cooked, cleaned, shopped, went to the gym, watched television, used the internet and played games on her phone. (R. at 57-70, 74, 221-22, 224.) She drove, handled money and went out with her family without issue. (R. at 59, 64, 224.) These significant responsibilities and activities support the ALJ's decision to afford less than substantial weight to the VA's disability determination.

While the ALJ did not use the precise language from *Bird* that the record "clearly demonstrate[d]" that the VA's rating warranted less weight, the ALJ's explanation — as borne

31

out by the record — shows just that. *Bird*, 699 F.3d at 343. The ALJ relied on Plaintiff's conservative treatment, clinical and examination findings, as well as Plaintiff's ongoing abilities to afford the VA rating limited weight. (R. at 739.) And the record clearly demonstrates that Plaintiff responded to the conservative treatment that she received and retained capabilities beyond what the VA's determination reflected. Substantial evidence in the record supports the decision, which the ALJ adequately explained pursuant to *Bird*. Thus, although the ALJ improperly set forth the *Bird* standard, she adequately explained her decision when assessing the VA's disability determination.

Moreover, the ALJ's error did not harm Plaintiff. Indeed, Plaintiff does not argue that she suffered harm from the ALJ's evaluation of the VA assessment. Instead, she simply views the evidence differently than the ALJ did — arguing that the evidence supports a finding of mental disability. (Pl.'s Mem. at 26-27.) But the evidence that the ALJ reviewed and cited when discounting the VA's disability rating clearly demonstrates that, during the relevant period, Plaintiff maintained greater functional capacity than the VA's decision would suggest. Thus, even if the ALJ had properly stated the *Bird* standard, no appreciable likelihood exists that the ultimate outcome would change. Consequently, the ALJ's error amounted to a harmless one.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) and Motion to Remand (ECF No. 9) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: June 6, 2018

33